# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

    Case No. 12-10221-01-EFM

CASEY D. EDEN,

    *Defendant.*

## MEMORANDUM AND ORDER

Defendant Casey Eden is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Eden filed several motions seeking to quash his arrest and suppress evidence due to alleged violations of the Fourth and Fifth Amendments. Because the Court finds that (1) Eden's arrest was lawful, (2) contraband items were in plain view during Eden's arrest, and (3) any information omitted from the warrant application was harmless error, the Court denies Eden's motions in their entirety.

### I.  Factual and Procedural Background

On September 21, 2012, Wichita police officers responded to a disturbance call at 338 North Volutsia, a residence located in Wichita. The residents of the home rented individual bedrooms from the homeowner. The complaining party, Amber Arrington, was an employee of the homeowner who was doing some remodeling within the house. Arrington stated that an

individual inside the home, Paul Klestinez, was present without owner's permission and refused to leave the premises.

Sergeant Bruce Watts and Officer Greg Robinson responded to the call. Sergeant Watts spoke with Klestinez, asking whether anyone else was present in the home. Klestinez responded that two other men were inside the house, but appeared to Sgt. Watts to be reluctant to name the individuals. Klestinez eventually identified one of the individuals as "Casey." Arrington, who was listening to the conversation from the street, further supplied that the man's name was Casey Eden and that he was wanted on a warrant from the Kansas Department of Corrections. Watts and Robinson confirmed that Casey Eden was wanted on a KDOC warrant that had been issued on September 6, 2012.

After returning briefly to the house, Klestinez informed Sgt. Watts that Eden's bedroom door was locked and he did not know whether Eden was present in the room. Sgt. Watts asked Klestinez if he would take the officers inside and point out Eden's bedroom door. Arrington did not object to the officers' entrance into the house.

Eden's allotted space within the house consisted of two rooms separated by French doors. In testimony, Eden referred to the room immediately off the hallway as a den and the room behind the French doors as his bedroom. The Court received conflicting testimony from Eden as to whether the den was a common room or one private to Eden.

When Sgt. Watts reached the door to Eden's rooms, he knocked for several minutes and identified himself as a police officer. Sgt. Watts testified that he heard movement from within the room and sent Officer Robinson outside to ensure that no one exited through the room's windows. Sgt. Watts then threatened to kick down the door if the occupant did not answer the door. The defendant opened the door and identified himself as Josh or Joshua. Believing that he

was lying, Sgt. Watts handcuffed Eden, first turning Eden so that his back faced Sgt. Watts and both were looking towards the interior of the room. As he was taking Eden into custody, Sgt. Watts allegedly saw a gun sitting in plain view on the bottom shelf of an entertainment unit and a baggie of what appeared to be drugs sitting on the couch. After handing Eden over to Officer Robinson on the front porch of the house, Sgt. Watts returned to Eden's bedroom, seized the firearm, and took it out to the front porch. Sgt. Watts then called for additional officers to assist in securing the residence because Sgt. Watts was unsure whether the third individual whom Klestinez had referenced was still present in the house.

After the officers secured the residence, Sgt. Watts took the handgun back into Eden's room and returned it to its previous location so that the officers could photograph the room and document the gun's original location. Because he was about to go off shift, Sgt. Watts discussed the case with Officer Christopher Hornberger, who would be the affiant when the police applied for a search warrant for the residence. Sgt. Watts described the events of the night, taking Officer Hornberger through the house as he spoke. The police did not have a search warrant at the time Sgt. Watts walked Officer Hornberger through the house, and Sgt. Watts did not specify whether he had seen the particular contraband items in plain view at the time of Eden's arrest or later during Sgt. Watts's protective sweep.

Using the information relayed from Sgt. Watts, Officer Hornberger completed an application for a search warrant. A warrant was subsequently issued by a state court judge. Nothing in the warrant application indicated that Sgt. Watts had moved the firearm before replacing it on the entertainment center to be photographed. Officer Hornberger's affidavit also failed to mention that Sgt. Watts had also done a protective sweep of the room and had not

conveyed to Officer Hornberger whether the contraband items were seen during Eden's arrest or during the protective sweep.

After the officers had secured the residence, they placed Eden in the back seat of a patrol vehicle. Officer Adam Vandermolen approached Eden and moved him to the front passenger seat of the car so that the two were sitting side by side. Eden was handcuffed in front of his body. Officer Vandermolen introduced himself and asked for Eden's personal information before reading Eden his *Miranda* rights from a laminated card issued by the police department. After informing Eden of his rights, Officer Vandermolen asked whether he understood those rights and whether he wanted to talk at that time. Eden answered in the affirmative.[1] Officer Vandermolen then asked Eden cursory questions about the house on Volutsia and the contraband items discovered inside.

Officer Robert Thatcher followed up with Eden shortly after Officer Vandermolen finished his questions. Officer Thatcher did not re-*Mirandize* Eden before talking with him. Eden had been returned to the back seat of the patrol car, still in handcuffs, and Officer Thatcher opened the car door and leaned down beside Eden to speak with him. At that time, Officer Thatcher asked Eden background questions similar to those asked by Officer Vandermolen. While transporting Eden to jail, Officer Thatcher told Eden that the officers had found ammunition that matched the bullets found in the firearm in Eden's clothing. In truth, Officer Thatcher did not know where the ammunition was discovered. Eden replied that he was aware of the ammunition and had gotten it for Klestinez and must have left some of it in a jacket

---

[1] Miranda Warning, Gov. Ex. 5.

pocket. Officer Thatcher's partner was present during this conversation, but did not testify. The conversation was not recorded.

Eden testified that he made no statement to Officer Thatcher about the ammunition, which was actually discovered in a box on a dresser in Eden's room. Eden further testified to a different version of his arrest. According to Eden, when Sgt. Watts knocked on his door, Eden exited the room and immediately closed his bedroom door behind him, preventing Sgt. Watts from seeing inside the room. As support for this assertion, Eden points to Sgt. Watts's report, which indicates that Eden was handcuffed once he "cleared the doorway." Eden also testified that even if the door was open at the time Sgt. Watts handcuffed Eden, it was impossible to see the bottom shelf of the entertainment unit where the firearm was located from the doorway. On cross-examination, Eden denied any knowledge or ownership of any of the contraband material discovered in the residence.

Presently before the Court are two motions to quash Eden's arrest and suppress evidence. In those motions, Eden makes five claims. First, Eden contends that his arrest was unlawful because it was not supported by reasonable suspicion of criminal activity. Second, Eden argues that the KDOC warrant was insufficient to support Eden's arrest because it was not signed by a judicial officer, but an officer of the executive branch. Third, Eden argues that the police erred in seizing evidence from Eden's residence because the items seized were not in plain view, rendering the affidavit in support of the warrant false. Fourth, Eden claims that the police violated the Fourth Amendment by removing the firearm from Eden's residence and then replacing it to be discovered later after obtaining a search warrant. Fifth, Eden alleges that any statements made to the police must be suppressed because his *Miranda* warning was defective in that it failed to spell out the procedures Eden could take to obtain an attorney prior to talking

with police. The Court heard and considered evidence on these arguments during a *Franks* hearing on May 28, 2013. For the following reasons, the Court denies Eden's motions.

## II. Analysis

Eden's claims essentially boil down to four issues for this Court to consider. First, the Court must determine whether Eden's arrest inside his residence was lawful, either because a valid warrant existed for his arrest, or because Sgt. Watts had probable cause for the arrest. Second, the Court must decide whether the firearm and bag of drugs seized after Eden's arrest were discovered in plain view. Third, the Court must consider whether the items seized during the execution of the search warrant for 338 North Volutsia must be suppressed because the officers omitted facts from the warrant application. Finally, Eden asks the Court to read into the *Miranda* doctrine a requirement that officers explain to suspects the procedure for obtaining a lawyer. The Court will address each issue in turn.

### A. Eden's arrest was lawful.

The preliminary question before the Court is whether Eden's arrest in his place of residence was lawful. Eden contends that Sgt. Watts had no authority to arrest him because (1) Sgt. Watts was not properly deputized by Eden's parole officer to make an arrest based on the KDOC warrant, and (2) Sgt. Watts had no other grounds for reasonable suspicion that Eden was involved in criminal activity. The Court disagrees.

Kansas statutes set forth the following rules and procedures for the arrest of a parolee who violates the terms of his release:

> At any time during release on parole, conditional release or postrelease supervision, the secretary of corrections may issue a warrant for the arrest of a released inmate for violation of any of the conditions of release, or a notice to appear to answer to a charge of violation. Such notice shall be served personally upon the released inmate. The warrant shall authorize any law enforcement

> officer to arrest and deliver the released inmate to a place as provided by subsection (g). *Any parole officer may arrest such released inmate without a warrant, or may deputize any other officer with power of arrest to do so by giving such officer a written or verbal arrest and detain order setting forth that the released inmate, in the judgment of the parole officer, has violated the conditions of the inmate's release.* A written arrest and detain order delivered to the official in charge of the institution or place to which the released inmate is brought for detention shall be sufficient warrant for detaining the inmate.[2]

Citing the italicized portion of section 75-5217(a), Eden argues that Sgt. Watts did not contact Eden's parole officer to obtain permission to take Eden into custody. As support, Eden points to *State v. Anderson*, in which the Supreme Court of Kansas held that mere probable cause to believe a person is a conditional release violator cannot justify a warrantless arrest.[3] In *Anderson*, the police contacted the Kansas Department of Corrections after detaining the defendant during a traffic stop and asked whether they could arrest the defendant for violating the terms of his release. Although no KDOC warrant had been issued at that time, the officers made the arrest on the verbal representation that a warrant would be executed at a later time.[4] Because the violation of conditional release is not a crime under the Kansas Criminal Code, the supreme court held that probable cause alone was insufficient to support the arrest.[5]

Eden's argument fails for several reasons. First, the Kansas Court of Appeals, addressing the holding in *Anderson* and the plain language of Kan. Stat. Ann. § 75-5217(a), held that a defendant was lawfully arrested pursuant to a KDOC warrant even though the warrant was not in the arresting officer's physical possession at the time of the arrest.[6] The court of appeals noted

---

[2] Kan. Stat. Ann. § 75-5217(a) (emphasis added).

[3] 136 P.3d 406, 415–16 (Kan. 2006).

[4] *Id.* at 409.

[5] *Id.* at 416.

[6] *State v. Edwards*, 179 P.3d 472, 475–76 (Kan. Ct. App. 2008).

that *Anderson* was factually distinguishable because no warrant had been issued at the time of the defendant's arrest.[7] Similarly, the KDOC had issued a warrant authorizing Eden's arrest more than two weeks before Sgt. Watts executed that warrant. The fact that Sgt. Watts did not have the warrant in his physical possession at the time of the arrest is immaterial.

Furthermore, Eden's claim that Sgt. Watts was required to contact the KDOC before arresting Eden fails to consider the plain language of Kan. Stat. Ann. § 75-5217(a). The sentence preceding the portion of the statute italicized above states that a KDOC warrant "authorize[s] *any law enforcement officer* to arrest and deliver the released inmate to a place as provided by subsection (g)."[8] Subsection (g) simply states that "[l]aw enforcement officers shall execute warrants issued by the secretary of corrections . . . in the same manner as for the execution of any arrest warrant."[9] A police sergeant is a law enforcement officer. And when executing any other type of arrest warrant that has already been issued, the police are not required to first ask permission from the issuer. Therefore, Sgt. Watts's execution of the KDOC warrant issued against Casey Eden comports with the plain language of section 75-5217.

Eden further argues that the KDOC warrant itself was invalid—and, by extension, that Kan. Stat. Ann. § 75-5217(a) is unconstitutional—because the warrant was not signed by a neutral and detached magistrate as required under the Fourth Amendment.[10] A "magistrate," for purposes of the warrant requirement, does not necessarily refer to a member of the judicial

---

[7] *Id.* at 475.

[8] Kan. Stat. Ann. § 75-5217(a).

[9] *Id.* § 75-5217(g).

[10] The Government urges the Court to avoid this constitutional question by applying the good faith exception to the exclusionary rule. Gov. Supplemental Resp., Doc. 42, at 2. But the good faith exception applies to warrantless *searches* rather than arrests, and the Government offers no authority that suggests analogical reasoning would permit the Court to overlook Eden's motion to quash his arrest as unlawful.

branch.[11] As interpreted by the Supreme Court, the Fourth Amendment requires that the individual issuing a warrant is both (1) neutral and detached from activities of law enforcement, and (2) capable of determining whether probable cause exists for the requested arrest or search.[12] The Court has held that neither the President nor a state attorney general meet this standard.[13] Municipal court clerks, on the other hand, are sufficiently detached to qualify as magistrates for purposes of issuing warrants.[14]

Here, Eden's warrant was signed by the Kansas Secretary of Corrections, and Kan. Stat. Ann. § 75-5217(a) also permits parole officers to arrest, and deputize police officers to arrest, offenders who have violated the terms of their conditional release. Although the secretary of corrections is a member of the executive branch, like the attorney general, the secretary of corrections has no authority over police investigations or subsequent prosecutions.[15] Similarly, parole officers, like clerks, often act as officers of the court, assisting judges with the determination of sentences and overseeing the execution of the same.[16] Furthermore, as those charged with overseeing offenders' release, employees of the department of corrections are in the best position to determine whether there is probable cause to believe that an offender has

---

[11] *See Shadwick v. City of Tampa*, 407 U.S. 345, 352 (1972) (rejecting "any per se invalidation of a state of local warrant system on the ground that the issuing magistrate is not a lawyer or a judge").

[12] *Id.* at 350.

[13] *United States v. U.S. Dist. Court for the E. Dist. of Mich.*, 407 U.S. 297 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443 (1971).

[14] *Shadwick*, 407 U.S. at 350–51.

[15] *Coolidge*, 403 U.S. at 450 ("In this case, the determination of probable cause was made by the chief 'government enforcement agent' of the State—the Attorney General—who was actively in charge of the investigation and later was to be chief prosecutor at the trial.").

[16] *Shadwick*, 407 U.S. at 351–52 ("The municipal court clerk is assigned not to the police or prosecutor but to the municipal court judge for whom he does much of his work. In this sense, he may well be termed a 'judicial officer.'").

violated his or her conditions of release. Therefore, the Court finds that Kan. Stat. Ann. § 75-5217(a) is constitutional, and Eden's arrest on a KDOC warrant was lawful.

B.     **The firearm and drugs were discovered in plain view.**

Having decided that Eden's arrest was made pursuant to a lawful warrant,[17] the Court turns to Eden's contention that the items discovered in his room must be suppressed as the fruits of a warrantless search. The Government argues that Sgt. Watts discovered the firearm and contraband in plain view when arresting Eden, and properly relied on that discovery when seeking a search warrant. The plain view doctrine permits the seizure of incriminating objects that are inadvertently discovered by the police.[18] For his seizure of the firearm and contraband to be lawful under the plain view doctrine the Court must find the following: (1) the incriminating nature of the items was immediately apparent; (2) Sgt. Watts was lawfully in a location from which he could see the items in plain view; and (3) Sgt. Watts had right of access to the items.[19]

Neither party argues that the firearm and drugs were not facially incriminating. Reviewing the second requirement, Sgt. Watts had authority to be in Eden's doorway at the time he saw the firearm on the entertainment center and the drugs on the couch because the KDOC warrant authorized Sgt. Watts to arrest Eden at his place of residence. The Court received conflicting testimony as to whether the items were in plain view of the doorway where Sgt. Watts stood. Eden testified that he had no knowledge of the gun and alleged that it was planted in the room after he left. Given the implausibility of Eden's frame-up theory, his shifty

---

[17]  *See Payton v. New York*, 445 U.S. 573 (1980) (holding that the seizure of contraband found in plain view during the warrantless arrest of a suspect inside his home was unlawful).

[18]  *See Coolidge*, 403 U.S. at 466.

[19]  *Horton v. California*, 496 U.S. 128, 136–37 (1990).

demeanor during his testimony, and the fact that he admitted to lying to Sgt. Watts about his identity when he first opened the door, the Court affords little to no credibility to Eden's account. Although Sgt. Watts and his fellow officers were careless in providing only an abbreviated account of the chain of events at Eden's residence in the warrant application, Sgt. Watts disclosed that omission on the stand, lending credibility to his account of Eden's arrest. Therefore, the Court takes Sgt. Watts at his word that he could see the firearm and drugs from the location of Eden's arrest.

Finally, Sgt. Watts had lawful right of access to the firearm and contraband at the time he saw it. Before Sgt. Watts entered the house, Klestinez said that a third individual shared the residence with Eden and himself. Given that another person may be in the house with access to a firearm, Sgt. Watts had authority to perform a protective sweep, providing right of access to the gun lying on the entertainment center and the drugs on the couch.[20] Consequently, Sgt. Watts properly seized the firearm and contraband pursuant to the plain view exception to the warrant requirement.

C. **The facts omitted from the warrant application would not have altered the judge's decision to issue a search warrant.**

Eden next argues that the Court should suppress all evidence seized during the execution of the search warrant for 338 North Volutsia because the warrant application did not accurately relate the events surrounding the seizure of the firearm and drugs. The Government admits that the police failed to tell the judge that the items had been removed from Eden's room and then replaced after the protective sweep, and the affidavit does not distinguish between items that Sgt.

---

[20] *See United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) (holding that seizure of duffle bags was lawful when officers smelled marijuana coming from the bags during a protective sweep of a residence).

Watts saw in plain view at the time of Eden's arrest and items that he later noticed, either during his protective sweep or the tour he gave to Officer Hornberger, neither of which were disclosed in the warrant application. The Government, however, contends that these errors did not affect the judge's probable cause determination.[21] Although the Court finds the police officers' unprofessional decision to omit and truncate the facts in the warrant application greatly troubling, the Court ultimately agrees that the judge's probable cause determination would not have changed if the police had been forthright in their affidavit. The Court can only hope that its decision in this case will encourage the Wichita Police Department to ensure that all officers make thorough and complete disclosures on future warrant applications.

**D.**    ***Miranda* does not require the police to instruct the accused on the methods for obtaining an attorney.**

Finally, Eden asks that the Court suppress any statements he made to Officers Vandermolen and Thatcher on the grounds that his *Miranda* rights were violated. Eden contends that his *Miranda* waiver was defective because Officer Vandermolen did not explain the procedures necessary for Eden to obtain a lawyer prior to speaking with the officers. As the Court indicated during the hearing on these motions, the *Miranda* warning is the product of a cornucopia of cases interpreting the Fifth Amendment right to freedom from self-incrimination. But to this Court's knowledge, no jurisdiction requires investigators to provide the accused with a step-by-step guide to procuring legal representation. Nor is such guidance necessary. If Eden wanted a lawyer present at the time he was questioned, he did not have to physically conjure

---

[21] *See Franks v. Delaware*, 438 U.S. 154, 156 (1978) ("In the event that . . . the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.")

counsel in order to cease the interrogation; he simply needed to ask for an attorney. The Court therefore concludes that Eden's *Miranda* waiver was valid.[22]

**IT IS ACCORDINGLY ORDERED** this 11th day of July, 2013, that Defendant Casey Eden's Motions to Quash Arrest and Suppress Evidence (Docs. 27, 28, 29, and 30) are hereby **DENIED**.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[22] To the extent Eden argues that his statements were coerced or made under duress, absent a due process claim, such arguments go to the weight, not the admissibility of those statements.